Karin M. Sweigart (SBN: 247462)
Jesse D. Franklin-Murdock (SBN: 339034)
**SWEIGART MURDOCK, LLP**
1160 Battery Street, Suite 100
San Francisco, California 94111
Telephone: (415) 873-0123
Facsimile: (873) 890-0791
Email: Karin.Sweigart@sm-llp.com;
Jesse@sm-llp.com

Attorneys for Plaintiff
Riley Cochran-Hernandez

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RILEY COCHRAN-HERNANDEZ, <br><br> Plaintiff, <br> v. <br><br> SAN JUAN UNIFIED SCHOOL DISTRICT; JEFFRY REMINGTON; MATT COSTA; and DOES 1–20, <br><br> Defendants. | **Case Number: 2:26−CV−01560−JAM−SCR** <br><br> **FIRST AMENDED COMPLAINT** <br><br> **(JURY TRIAL DEMANDED)** |

First Amended Complaint

Plaintiff Riley Cochran-Hernandez, by and through his attorneys, Sweigart Murdock, LLP, for a Complaint against Defendants San Juan Unified School District, Jeffry Remington, Matt Costa, and Does 1–20, alleges and avers as follows:

## I.    INTRODUCTION

1.    Plaintiff Riley Cochran-Hernandez spent years working toward his goal of being a high school and college football player. His hard work, commitment, and athletic prowess, paid off at Del Campo High School ("Del Campo") in the San Juan Unified School District ("District") when he joined the football team and was on track to becoming a collegiate athlete.

2.    Rather than foster a respectful, sportsmanlike culture that Riley and his teammates deserved, Del Campo coaches Jeffry Remington and Matt Costa subjected Riley to treatment no child should ever experience.

3.    During his time on the Del Campo football team, Coaches Remington and Costa engaged in racial and national-origin harassment, made discriminatory immigration-related comments, disregarded medical directives and exacerbated a known injury, imposed unsafe conditioning practices with restricted hydration, subjected students to humiliating and abusive treatment, and retaliated against Riley after he and his father reported misconduct.

4.    Coaches Remington and Costa's abuse resulted in physical and emotional trauma for Riley. Riley has a serious and painful long-term physical limitation that was completely avoidable. Riley's daily life is plagued by medical complications. The abuse he experienced coupled with the disruption of his football career has caused Riley to experience significant emotional distress.

5.    Riley's account of what took place on the Del Campo football team is not mere allegation. Before this case began, Riley initiated a formal Uniform Complaint Procedure investigation by filing a complaint against Coaches Remington and Costa. Following a comprehensive investigation, the District sustained the majority of Riley's charges, conceding that various forms of gross misconduct had taken place at Del Campo.

6.    Despite its findings of significant misconduct, the District failed to provide Riley with any meaningful relief. Though the District acknowledged the horrific treatment Riley experienced, it did nothing to make up for the pain and suffering Riley experienced under its care and supervision.

First Amended Complaint

7.    In this lawsuit, Riley will prove the same wrongdoing on the part of Coaches Remington and Costa that the District already found took place in its investigation. But this time, Riley expects to obtain the justice the District has denied him so far.

## II.    JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Riley asserts claims arising under the laws and Constitution of the United States, including claims under 42 U.S.C. § 1983 for violations of the Equal Protection Clause and the Due Process Clause, as well as claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and its implementing anti-retaliation regulation, 34 C.F.R. § 100.7(e). This Court has supplemental jurisdiction over Riley's state law claims—including claims for negligence, intentional infliction of emotional distress, and violation of California Education Code § 220—pursuant to 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy as the federal claims and arise from the same nucleus of operative facts.

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all acts and omissions giving rise to the claims asserted herein occurred within Sacramento County, California, which lies within the Eastern District of California. Intradistrict assignment is therefore proper at this Court's Sacramento courthouse.

10.    Riley's claims are timely. Riley was a minor during all relevant events described herein. Under California Code of Civil Procedure § 352(a), the applicable statute of limitations was tolled during his minority and did not begin to run until Riley reached the age of eighteen. Riley has additionally complied with the Government Claims Act by timely filing a government tort claim, pursuing late-claim relief, and filing this action after exhausting all available administrative remedies.

## III.    PARTIES

11.    Plaintiff Riley Cochran-Hernandez is a former student-athlete of Hispanic descent who played football for Del Campo High School, a school operated by Defendant San Juan Unified School District. While Riley has since reached the age of majority, all actions described in this Complaint were taken against him while he was a minor.

12.    Defendant San Juan Unified School District ("District") is a public school district

3

First Amended Complaint

receiving federal funds.

13. Defendant Jeffry Remington ("Coach Remington") is an individual who acted under color of state law as an agent and employee of the District at all times relevant herein before being dismissed for the misconduct at issue. He is being sued in his individual capacity.

14. Defendant Matt Costa ("Coach Costa") is an individual who acted under color of state law as an agent and employee of the District at all times relevant herein before being dismissed for the misconduct at issue. He is being sued in his individual capacity.

15. Defendants DOES 1–20 are individuals and/or entities whose true names and capacities are presently unknown to Plaintiff, including but not limited to administrators, supervisors, employees, agents, and policymakers of the District. Each DOE Defendant participated in, authorized, ratified, or failed to prevent the unlawful conduct alleged herein in some form or fashion. Plaintiff will amend this Complaint to substitute their true names and capacities when discovered.

## IV.    FACTUAL ALLEGATIONS

### A. Riley's Dream to Become a Football Player

16. Riley's dream to be a star football player began when he was four years old, when he first began playing with a football. As Riley grew up, his love for football grew too, playing catch with his father, and later, playing organized flag football in fifth grade.

17. With encouragement from his father, Riley continually strove to be a better football player. While he was growing up, he would ask his father almost every day to take him to a high school football field so he could practice. Football was not just a hobby; it was, in Riley's words, his "lifeline."

18. Eventually, Riley decided his goal was to attend and play football for the University of Michigan, where his favorite player, Charles Woodson, had played. Riley dreamed not just of excelling on the field, but also creating a positive legacy, as Woodson had.

19. Riley was consistently the underdog when he played sports. His teammates and coaches would underestimate him, until he would prove his skill and dedication. In eighth grade, Riley had two coaches who believed him and mentored him. These two coaches tried to convince Riley to attend Foothill High School, but, unfortunately, Riley ultimately attended Del Campo.

///

4

First Amended Complaint

**B. Riley Joins the Del Campo Football Team.**

20.    Riley began playing football at Del Campo his freshman year. His first year on the team was a mixed bag. On the positive side, he met his best friend, A. R., the quarterback. The coaches, particularly, Coach Costa however, gave Riley the impression that they disliked him. Despite this obstacle, Riley excelled on the field, becoming the only member of the team with a receiving touchdown that year.

21.    During his sophomore year, Coach Costa's treatment of Riley became worse. Although Riley had proven his abilities the prior year, Riley was only permitted to play approximately three games due to the coaches' favoritism. Riley nonetheless excelled when he was given the opportunity to play, which his statistics on the field made clear.

**C. The Del Campo Coaches Create a Hostile Environment for Riley.**

22.    Despite his lifelong love for football and his dedication to the sport, Riley suffered years of abuse at the hands of two members of the coaching staff: Coach Remington and Coach Costa, both of whom held the title of Head Coach. Coach Costa was on the coaching staff throughout Riley's time at Del Campo, and Coach Remington joined the team during Riley's junior year.

23.    From his early days on the team, Coach Costa continually sidelined him and diminished his contributions to the team, ignoring his exemplary performance when he was allowed to play.

24.    The problems at Del Campo went far beyond favoritism.

25.    Coach Costa instituted group punishment in response to isolated behavioral lapses, forcing the boys to do bear crawls in 110 degree weather, leading the boys to burn their hands, a practice Coach Remington continued after he joined the team.

26.    Practices typically lasted approximately two to three hours, during which players were permitted only one to two water breaks, regardless of the weather conditions.

27.    Coach Costa (and later, Coach Remington) would also yell at the boys and belittle them.

28.    Coaches Costa (and later, Coach Remington) repeatedly used profanity and derogatory language in front of student-athletes during practices, team meetings, and training activities. Coach Remington even used the N-word in front of students during practice. The racial slurs were directed at and used in the presence of Black and other minority students, contributing to an environment of racial

5

First Amended Complaint

hostility and fear in which students felt degraded, surveilled, and unsafe.

29.    Coach Costa led recurring team rituals that required players to participate in humiliating chants involving profane language. For example, coaches initiated a repeated call-and-response exercise in which a coach would ask, "What does it smell like?" and players were expected to respond with profane phrases such as "like s—" or "bulls—." These rituals were conducted publicly in front of teammates, served no legitimate instructional purpose, and were designed to demean and embarrass players as a form of control and intimidation.

30.    Coach Costa routinely used demeaning and profane language toward players and staff during practices and team activities. This included calling players derogatory names, using explicit profanity to criticize performance, and directing vulgar insults at individual students in front of their peers. The profanity was not isolated or incidental, but pervasive, and contributed to an environment in which verbal abuse was normalized and students were subjected to ridicule rather than constructive coaching.

**D.  Riley Takes Leave from the Del Campo Football Team to Recover from the Abusive Environment.**

31.    Sadly, Riley fell out of love with football, as the coaches' abusive and mean-spirited conduct eclipsed his innate passion for the game. Riley therefore made the difficult decision of staying off the football field his junior year, deciding to focus on his mental health, which was in poor shape because of how he was treated on the football team.

32.    While Riley made the difficult decision of staying off the team his junior year, he promised his dad—and himself—that he would return to the team his senior year.

33.    When Riley rejoined the team, things seemed okay—at first. The team was focused mainly on conditioning (running, lifting weights), and Riley did not face any immediate problems.

**E.  Coach Remington Forced Riley to Play with an Injured Leg.**

34.    Everything changed for the worse when Riley pulled a muscle in his leg, which turned out to be a torn quadriceps muscle in early March 2025. Riley's coaches should have recognized the severity of this injury and put Riley's health first. Coach Remington, however, failed to take his injury seriously, even though Riley presented a doctor's note asking that Riley rest for a week until he could

First Amended Complaint

receive an MRI. Coach Remington criticized other players who took time off to recover from quad injuries and dismissed Riley's injury in front of his teammates. Coach Remington told Riley that if he did not practice, he would be removed from the team. Coach Remington further dismissed Riley's doctor's note because it was from his primary care physician.

35.    Determined to stay on the football team and prove himself, Riley continued playing with his injured leg. After playing a game of seven-on-seven, Riley was unable to run, and eventually the pain became so bad that he could not walk. Riley returned to the doctor and learned that the muscle tear now extended from his knee to close to the top of the leg. Because the coaches refused to let Riley heal, he now would be unable to play football for nine weeks. Riley was distraught.

36.    Riley presented Coach Remington with the new note and pictures of his leg. Coach Remington brushed it off again, but this time let Riley follow the doctor's instructions.

### F.  The Del Campo Coaches Exclude Riley from a Team Trip to Tahoe.

37.    In the summer of 2025, while Riley was recovering from his leg injury, he eagerly awaited a team trip to Tahoe, where the boys would camp and play football. Riley understood he could not play football in his injured condition, but he was nonetheless excited to join his friends and teammates for a camping trip. Growing up in a low-income household with a single parent, Riley had never gone on a camping trip, and he was extremely excited.

38.    Coach Remington and Coach Costa punished Riley—whether in retaliation for his injury or due to gratuitous cruelty—by disinviting him from the Tahoe camping trip. Coach Costa told Riley that the camp told Del Campo that Riley could not attend in his injured state. To add insult to injury, the coaches delivered the news on Father's Day (June 15, 2025), ruining the day for both Riley and his father.

39.    Following the District's investigation, Riley learned that the camp would have allowed Riley to attend, but Coach Remington and Coach Costa made an executive decision not to allow Riley to attend, abusing their authority and violating District rules in so doing.

### G.  Riley Complains About the Del Campo Coaches and Faces Retaliation.

40.    As bad as things were at Del Campo, they became worse. The coaches tried to isolate Riley and bullied him to increasing extents.

First Amended Complaint

41.    During a team activity in the spring of 2025, Coach Remington addressed the team and made a comment referencing Immigration and Customs Enforcement ("ICE") and a monetary figure of "$1,500," the comment suggesting to students that immigrant students or those without legal status could be reported to federal immigration authorities for enforcement action and implying a financial dimension to such reporting. The comment was made to a group that included Hispanic and immigrant students. Riley, who is of Hispanic descent, was present and understood the comment as a reference to students of his background and community. The comment was not a private remark but was delivered in a team setting where all players could hear it.

42.    When someone created an anonymous Instagram account to disparage members of the Del Campo coaching staff, on or around July 28, 2025, Coach Costa falsely, and without any basis, accused Riley of being the culprit.

43.    The last straw for Riley was when he learned that the coaches discussed badmouthing his best friend A. R. to colleges.

44.    Shortly after the meeting with the principal, Coach Remington and Coach Costa began retaliating against Riley.

45.    Riley had finally earned a starting spot on the football team, but Coach Remington and Coach Costa removed him from the starting lineup just one day after the meeting. They even tried to pressure Riley into quitting the team. Fortunately, Riley's father helped strengthen Riley's resolve so that he would not succumb to the coaches' pressure and bullying.

46.    On July 29, 2025, Riley joined two Del Campo Coaches, multiple players, and his father in a meeting with Del Campo's principal, where they explained what Coach Remington and Coach Costa had subjected them to on the football team, including their use of the N-word, and other racists and sexist comments. Riley mentioned how the abuse began when he was a freshman but that nothing had ever been done about it.

47.    On August 22, 2025, when Del Campo had its first game of Riley's senior season, Coach Remington and Coach Costa only permitted Riley to step on the field twice.

48.    During Riley's second and third games, his injured leg began to hurt and went numb.

49.    On September 8, 2025, the Monday after the third game, Coach Remington and Coach

8

First Amended Complaint

Costa told Riley that he was cut from the football team, saying they overheard Riley tell a teammate that he never played for a team that cannot read defense. This was obvious pretext, as it was clear Riley was cut from the team out of retaliation for telling the principal about the abuse he faced on the team.

50.     That same day, Riley was removed from the Del Campo football team's official group chat, which was maintained on the Band application.

51.     In or around September 2025, Riley was excluded from the Del Campo football team's official photo shoot.

**H. The District's Uniform Complaint Procedure Process Revealed Shocking Misconduct by Coach Remington and Coach Costa.**

52.     On or around July 30, 2025, Riley's father initiated a formal Uniform Complaint Procedure process based on Coach Remington and Coach Costa's mistreatment of him.

53.     The District conducted a comprehensive investigation and sustained almost all Riley's allegations. Its investigatory report, which is attached as **Exhibit 1**, confirms the multifaceted and years-long pattern of abuse Riley alleged above. The District's findings include the following:

a.   Coach Remington pressured Riley to continue practicing despite a documented injury and without an appropriate referral for further evaluation.

b.   Coach Remington used the N-word in the presence of students during practice, constituting discriminatory and harassing behavior in violation of the District's Board Policy and professional standards.

c.   Coach Remington engaged in discriminatory conduct in violation of the District's Board Policy and nondiscrimination laws by suggesting that players could receive a monetary award for reporting fellow students to ICE.

d.   Coach Remington engaged in unprofessional and inappropriate conduct by making disparaging comments about a colleague in front of students, violating the District's Board Policy and contributing to a hostile environment for staff and students.

e.   Coach Costa forced students to participate in a bear crawl drill under extreme and unsafe conditions, resulting in physical harm to students, including dehydration, heat-related illness, and severe blistering on their hands, amounting to unreasonable physical activity

9

First Amended Complaint

outside the statutory exception in Education Code § 49001.

f.   Coach Costa engaged in repeated demeaning and profane verbal conduct toward players and staff, amounting to verbal bullying in violation of the District's Administrative Regulations and professional standards.

g.   Coach Costa led a team ritual that constituted verbal and social/relational bullying in violation of the District's Administrative Regulations, which fostered an intimidating and demeaning environment for students.

h.   Coach Costa, in turning away a Black father who wanted to join the coaching staff, communicated in a manner and acted inconsistently with fair and nondiscriminatory hiring practices, in potential violation of the District's Board Policy.

i.   Coach Remington and Coach Costa limited water breaks and did not provide adequate care for student-athletes during football practices, constituting bullying and a failure to provide safe and reasonable athletic conditions in violation of the District's Administrative Regulations.

j.   Coach Remington and Coach Costa engaged in intimidation and harassment of Riley in violation of the District's Board Policy by targeting and pressuring Riley with the goal of removing him from the football team.

k.   Coach Remington and Coach Costa intentionally restricted Riley from attending the Tahoe camping trip, amounting to a misuse of authority and a prohibited action under the District's Administrative regulations.

l.   Coach Remington and Coach Costa retaliated against Riley for participating in the District's complaint process by discussing strategies to remove Riley from the team, reducing his playing time, and ultimately removing him form the team, violating the District's anti-retaliation Board Policy.

54.   While the District sustained the majority of Riley's complaints about Coach Remington and Coach Costa, it lacked evidence to sustain other charges, such as Riley's allegation that Coach Remington grabbed another student by the neck and pushed him, that Coach Costa engaged in corporal punishment or inappropriate use of physical force, that Coach Costa engaged in inappropriate

10

First Amended Complaint

socialization or made inappropriate disclosures to students, and that Coach Remington and Coach Costa intended to interfere with players' collegiate opportunities. The District further declined to make a specific finding as to whether Coach Costa falsely accused him of creating an Instagram account that made disparaging comments about the Del Campo coaching staff. With the benefit of discovery, Riley fully expects to prove these allegations as well.

55.    Following the District's completion of the UCP investigation and its issuance of written findings sustaining the allegations against the Del Campo coaching staff, Coach Remington and Coach Costa were removed from their positions with the football program. The termination of the coaching staff was itself a formal admission by the District that the misconduct was serious, substantiated, and incompatible with the continued employment of the individuals responsible.

**I.    Riley Rejoins the Del Campo Football Team.**

56.    After the investigation concluded and the coaching staff was terminated, Riley had to fight to be reinstated to the team, only to be excluded from meaningful participation during the remainder of the season due to his still-healing injury. At the end-of-season awards ceremony, rather than receiving any acknowledgment of his perseverance through extraordinary adversity, Riley was publicly presented with a "most drama" award in front of his teammates—a gratuitous act of humiliation that confirmed for Riley, in unmistakable terms, that the institution had never seen him as a victim. Riley was only restored to the team's group chat on the Band application on October 28, 2025, three days before the last game, when a team mom needed information from Riley.

**J.    Riley Has Suffered Substantial Physical and Emotional Harm.**

57.    As a result of these events, Riley has suffered profound and enduring physical, psychological, and developmental harm.

58.    Riley's removal from the football team devastated him. The goal and passion he spent nearly his entire life working toward was gone. Riley realized he lost the opportunity to play football in college and beyond.

59.    Riley's physical injuries are serious, ongoing, and of uncertain long-term prognosis. What began as a torn quadriceps—an injury that should have resolved with rest—was transformed by Defendants' deliberate disregard of medical directives into a complete quadriceps tear extending from

11

First Amended Complaint

the knee to the top of the leg. Forced to practice while injured, to compete in seven-on-seven games despite being unable to walk without pain, and ultimately to forgo the rest his treating physician prescribed, Riley suffered a catastrophic worsening of his condition that required an extended period of supervised rehabilitation. As of the filing of this Complaint, Riley has been diagnosed with peripheral nerve damage to his injured leg—a complication physicians attribute to the aggravation of the original injury. Riley has been prescribed medication to manage persistent nerve pain. The full extent of the nerve damage has not yet been determined, and his treating providers have not yet been able to advise him whether his condition will stabilize, require surgical intervention, or result in permanent impairment. Riley regularly experiences prolonged episodes of complete numbness in his leg lasting approximately an hour and a half, during which he is unable to walk normally. These episodes recur without warning and interfere with Riley's ability to engage in ordinary daily activities.

60.    Riley's psychological injuries are equally severe. Having been stripped of his starting position as punishment for reporting misconduct, excluded from a team bonding trip—a trip he had never been able to take in any other context, given the financial circumstances of his household—and ultimately cut from the team while an investigation into his coaches' misconduct was ongoing, Riley suffered a devastating loss of identity and purpose. He watched the season continue without him. He attended a rival game and broke down in tears watching his teammates practice, knowing that his dream had been taken from him—not by failure or lack of ability, but by the very adults charged with developing and protecting him. His academic performance declined. A five-year relationship ended under the weight of his emotional deterioration. He stopped watching football on television because the sight of it brought back the full force of what he had lost.

61.    Riley sought and continues to receive professional mental health treatment as a direct result of the events described in this Complaint. Despite that treatment, he reports that therapy has provided limited relief and that he continues to mask his suffering at school, presenting a composed exterior to his peers while struggling internally with anxiety, depression, and a profound loss of motivation.

62.    Riley's college and professional athletic prospects have been materially and potentially permanently foreclosed. Having missed the entirety of his senior season's meaningful competitive play

12

First Amended Complaint

during the critical period for collegiate recruitment, Riley received no offers, no legitimate exposure, and no opportunity to demonstrate the ability that his previous coaches recognized and that he had spent his entire life developing. His best friend and former teammate went on to be ranked among the top players in California during the same season that Riley was sidelined, retaliated against, and ultimately cut.

## V.     EXHAUSTION OF REMEDIES

63.     Prior to filing suit, Riley satisfied the administrative prerequisite to filing suit by filing a Government Claims Act notice on the District for all claims for which administrative exhaustion was required.

## VI.     CLAIMS FOR RELIEF

## COUNT I

## Title VI – Hostile Educational Environment

## (All Defendants)

64.     Riley incorporates all prior paragraphs as if fully set forth herein.

65.     At all relevant times, the District and its schools, including Del Campo, were recipients of federal financial assistance and therefore subject to the nondiscrimination requirements of Title VI of the Civil Rights Act of 1964.

66.     Riley was subjected to severe, pervasive, and objectively offensive harassment on the basis of race and national origin, including the repeated use of racial slurs by coaching staff, discriminatory comments invoking immigration enforcement against immigrant and Hispanic students, and discrimination against a Black father who tried to join the coaching staff. Defendants had actual knowledge of this harassment through multiple reports to school administrators, staff observations, and the District's own investigation conducted pursuant to the Uniform Complaint Procedure.

67.     Despite this actual knowledge, Defendants responded with deliberate indifference. The District failed to take prompt and effective action to stop the harassment, allowed the conduct to persist until an external complaint forced intervention, and permitted the same staff members to continue supervising and interacting with students. In its written findings, the District ultimately sustained the allegations of discriminatory conduct, confirming that Defendants' response was clearly unreasonable

13

First Amended Complaint

in light of the known circumstances and resulted in a hostile educational environment that deprived Riley of equal access to the educational benefits and opportunities provided by the District.

68.     Defendants' failure to take prompt and effective corrective action was clearly unreasonable in light of the known circumstances, satisfying the deliberate indifference standard under Title VI.

69.     As a direct and proximate result of Defendants' wrongful conduct, Riley suffered loss of educational and athletic opportunities, emotional distress, and other damages.

## COUNT II

## Title VI Retaliation

## (All Defendants)

70.     Riley incorporates all prior paragraphs as if fully set forth herein.

71.     Riley and his parent engaged in activity protected under Title VI when they reported and opposed discriminatory conduct, including racial harassment and national-origin discrimination, and when they participated in the District's Uniform Complaint Procedure investigation.

72.     Defendants had actual knowledge of Riley's protected activity. Coaching staff and administrators were aware of the complaints and the ongoing investigation at the time they took adverse actions against Riley.

73.     After and because Riley engaged in protected activity, Defendants subjected Riley to materially adverse actions that would dissuade a reasonable student from making or supporting a complaint of discrimination. These actions included reducing his participation and playing time, subjecting him to heightened scrutiny and hostility, levying false accusations against him, and ultimately removing him from the team.

74.     The timing and circumstances of Defendants' actions, including staff discussions about pressuring Riley to quit or creating a justification for his removal, demonstrate a causal connection between Riley's protected activity and the adverse actions taken against him. Defendants' asserted reasons for these actions were pretextual and not supported by legitimate, non-retaliatory considerations.

75.     In its written Uniform Complaint Procedure findings, the District sustained the

14

First Amended Complaint

retaliation allegation, confirming that the adverse actions taken against Riley were linked to his protected complaints and constituted retaliation in violation of Title VI and its implementing regulations.

76.    Even after the District sustained a majority of the allegations against Coach Remington and Coach Costa, and Riley was allowed back on the football team, he still faced retaliation in the form of the "most drama" award, which was publicly bestowed on him in front of his teammates in an act of humiliation.

77.    As a direct and proximate result of Defendants' retaliatory conduct, Riley suffered loss of educational and athletic opportunities, emotional distress, and other damages, and was chilled from fully exercising his rights to report discrimination and participate in protected complaint processes without fear of reprisal.

## COUNT III

### 42 U.S.C. § 1983 – Equal Protection

### (All Defendants[1])

78.    Riley incorporates all prior paragraphs as if fully set forth herein.

79.    At all relevant times, Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

80.    Riley is a member of protected classes and was entitled to the equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution.

81.    Defendants, through their employees and agents, intentionally subjected Riley to disparate and adverse treatment based on race and national origin. This conduct included the repeated use of racial slurs by coaching staff, discriminatory comments invoking immigration enforcement against immigrant and Hispanic students, and the toleration of a hostile and intimidating environment

---

[1] Plaintiff acknowledges that *Belanger v. Madera Unified School District*, 963 F.2d 248, 251 (9th Cir. 1992) currently forecloses this claim against the District under binding Ninth Circuit precedent. Nevertheless, Plaintiff pleads this cause of action to preserve the issue for appellate review, including in light of the Ninth Circuit's recent en banc decision in *Kohn v. State Bar of California*, 87 F.4th 1021 (9th Cir. 2023).

15

First Amended Complaint

that singled out students belonging to protected classes.

82.    Defendants had actual knowledge of this discriminatory conduct and failed to take prompt and effective corrective action. Instead, Defendants allowed the conduct to persist, permitted the same staff members to continue supervising students, and took no meaningful steps to protect Riley from further discrimination until compelled to act through the formal complaint process.

83.    Defendants' actions and omissions were intentional, discriminatory, and not rationally related to any legitimate governmental or educational objective. Similarly situated students who did not belong to Riley's protected classes were not subjected to comparable harassment, intimidation, or adverse treatment.

84.    As a direct and proximate result of Defendants' conduct, Riley was denied equal access to the educational benefits, services, and opportunities provided by the District, including participation in athletics free from discrimination, safety from racial hostility, and a supportive learning environment.

85.    The discriminatory conduct described herein was carried out pursuant to Defendants' customs, practices, and deliberate indifference, including a culture that tolerated racial harassment, discouraged reporting, and failed to supervise or discipline staff despite known misconduct.

86.    Defendants' violations of Riley's right to equal protection caused Riley substantial harm, including emotional distress, loss of educational and athletic opportunities, and other damages for which Defendants are liable under 42 U.S.C. § 1983.

## COUNT IV

## 42 U.S.C. § 1983 – Due Process

## (All Defendants[2])

87.    Riley incorporates all prior paragraphs as if fully set forth herein.

---

[2] Plaintiff acknowledges that *Belanger v. Madera Unified School District*, 963 F.2d 248, 251 (9th Cir. 1992) currently forecloses this claim against the District under binding Ninth Circuit precedent. Nevertheless, Plaintiff pleads this cause of action to preserve the issue for appellate review, including in light of the Ninth Circuit's recent en banc decision in *Kohn v. State Bar of California*, 87 F.4th 1021 (9th Cir. 2023).

16

First Amended Complaint

88.     At all relevant times, Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

89.     Riley possessed protected liberty and property interests under the Fourteenth Amendment, including the right to be free from arbitrary governmental action, the right to pursue educational opportunities without unjustified interference, and the right to be free from stigmatizing punishment imposed without notice or a meaningful opportunity to be heard.

90.     Defendants deprived Riley of these protected interests when they excluded him from team activities, reduced his participation and playing time, and ultimately removed him from the football program without providing notice of the alleged basis for these actions, without affording Riley or his parent an opportunity to respond, and without any meaningful procedural safeguards.

91.     Defendants' actions were not routine coaching decisions but constituted punitive and retaliatory measures that carried significant consequences for Riley's education and future prospects. Riley's removal from the team occurred during a critical recruiting period, effectively foreclosing his ability to pursue collegiate athletic opportunities and scholarships and impairing his access to postsecondary educational benefits.

92.     Defendants' actions also imposed a stigmatizing injury on Riley by signaling to peers, staff, and third parties that Riley had engaged in misconduct or was unfit to participate, despite the absence of any disciplinary finding, rule violation, or legitimate athletic justification. This stigma, combined with the tangible loss of opportunities, constituted a deprivation of liberty without due process of law.

93.     Defendants' conduct was arbitrary, capricious, and conscience-shocking, particularly given that Riley was a minor, was acting pursuant to medical restrictions, and had engaged in protected activity by reporting misconduct. Defendants failed to follow their own policies and procedures and instead exercised unchecked discretion in a manner divorced from legitimate educational objectives.

94.     Riley was entitled, at minimum, to notice of the reasons for his exclusion and an opportunity to respond before being deprived of participation and related educational opportunities.

95.     The deprivation of Riley's protected interests occurred pursuant to Defendants' customs, practices, and deliberate indifference, including a failure to implement adequate procedures

17

First Amended Complaint

governing exclusion from extracurricular activities, tolerance of retaliatory decision-making by staff, and ratification of punitive actions without procedural review.

96.    As a direct and proximate result of Defendants' violations of Riley's procedural and substantive due process rights, Riley suffered emotional distress, reputational harm, loss of educational and athletic opportunities, and other damages for which Defendants are liable under 42 U.S.C. § 1983.

## COUNT V

### Negligence

### (All Defendants)

97.    Riley incorporates by reference all prior allegations as though fully set forth herein.

98.    Defendants owed Riley a duty of care as a minor student-athlete participating in a school-sanctioned extracurricular program. This duty arose from the special relationship between a school and its students, from Defendants' voluntary assumption of supervisory responsibility over Riley's physical welfare during practices, training, and competition, and from California statutes and regulations governing the safety of student athletes, including those requiring schools to follow physician directives regarding the participation of injured students.

99.    Defendants breached this duty through multiple acts and omissions. Riley presented coaching staff with a physician's note on March 11, 2025, documenting a significant injury and directing him to refrain from athletic participation pending further evaluation. Rather than honor that directive, Coach Remington and Coach Costa dismissed it, minimized the injury, and threatened Riley with removal from the team if he did not continue to practice. Defendants thereby placed a seventeen-year-old student in the position of choosing between his medical welfare and his roster spot. He chose the sport, because Defendants gave him no reasonable alternative. He played through escalating pain in seven-on-seven competition until he could no longer walk, and was only permitted to rest after a second medical evaluation confirmed a full quadriceps tear. Defendants' conduct in requiring and coercing Riley to practice while injured, despite written medical instruction to the contrary, constituted a breach of the standard of care applicable to scholastic athletic supervisors.

100.    In addition, and in the alternative, Defendants are liable under a theory of negligence per se. California Health and Safety Code § 124235 and associated regulations governing youth athletic

First Amended Complaint

programs impose mandatory injury-management requirements on schools and their coaching personnel. The California Interscholastic Federation ("CIF") rules and California Education Code provisions governing student athlete health impose specific, non-discretionary obligations on coaches and schools, including the requirement to comply with return-to-play directives issued by treating physicians. These statutes and regulations were enacted for the protection of a class of persons—minor student-athletes—against precisely the type of harm that occurred here: aggravated physical injury resulting from premature or coerced return to athletic participation while medically restricted. Defendants' violation of these statutory obligations constitutes negligence per se, and Riley is entitled to rely on this theory without the burden of establishing breach through expert testimony regarding the standard of care.

101. Defendants' negligence was a direct and proximate cause of Riley's injuries. The initial quadriceps tear was a manageable, recoverable condition. Because Defendants compelled Riley to continue practicing on that injury, it progressed into a complete quadriceps tear with complications extending from the knee to the upper leg. Because the tear was not permitted to heal under medically appropriate conditions, Riley subsequently developed peripheral nerve damage in the affected limb. As of the date of this filing, Riley's physicians have not determined the full extent of the nerve damage, cannot yet advise whether Riley will experience permanent functional impairment, and have prescribed medication for ongoing nerve pain. Riley's nerve damage represents a foreseeable consequence of the progressive injury that Defendants' breach caused or substantially contributed to. The District has itself admitted in its UCP findings that coaching staff disregarded physician directives concerning Riley's injury.

102. The District is vicariously liable for the negligent acts of its employees and agents through Government Code § 815.2, including Defendants Remington and Costa, who acted within the scope of their employment when they directed and supervised Riley's athletic activities.

103. As a direct and proximate result of Defendants' negligence, Riley has suffered physical injury, nerve damage of uncertain permanence, ongoing pain, impaired mobility, the need for prescription medication and continuing medical care, loss of athletic opportunities during a critical developmental and recruitment period, and associated economic and non-economic damages in

19

First Amended Complaint

amounts to be proven at trial.

## COUNT VI

### Intentional Infliction of Emotional Distress

### (All Defendants)

104.    Riley incorporates by reference all prior allegations as though fully set forth herein.

105.    Coach Remington and Coach Costa's conduct toward Riley was extreme and outrageous. Riley was a minor student-athlete who had devoted his entire life to a single dream. He arrived at Del Campo not as a problem, but as a young man of uncommon commitment who had already overcome years of playing beneath coaches who overlooked him, who had taken a year away from the sport to protect his mental health, and who returned for his senior year—with a promise to his father—determined to compete and be seen.

106.    The conduct at issue goes well beyond that which is expected in a lawful scholastic athletic program or which a reasonable student should be expected to endure. Coach Remington and Coach Costa used racial slurs in front of students, made thinly veiled threats of immigration enforcement targeting Hispanic youth, forced students to perform bear crawls in 110-degree heat until their hands were burned, subjected players to ritualized humiliation designed to demean and control, dismissed a physician's written medical directive and threatened a physically injured minor with removal from the team if he did not play through the pain, deliberately excluded Riley from the team's camping trip on Father's Day based on a lie about him not being allowed at the campsite, stripped him of his starting position without cause the day after he appeared before the school principal to report misconduct, and schemed among themselves to manufacture a pretext to cut him. They then cut him. After an investigation substantiated the bulk of these allegations and the coaching staff was removed, Defendants permitted Riley's reinstatement but ensured he could not play due to his still-unresolved injury. At the post-season awards ceremony, rather than acknowledge the ordeal Riley had endured, the coaches gave him a "most drama" award and let his teammates laugh.

107.    Defendants' conduct was intentional and, in the alternative, reckless with respect to its effect on Riley. The sequence of adverse actions taken against Riley after he engaged in protected activity were not accidents of scheduling or judgment. They were deliberate acts, designed to punish a

20

First Amended Complaint

minor for speaking the truth about his coaches. The District has itself sustained the retaliation finding. Defendants knew what they were doing to Riley, and they did it anyway.

108.    As a direct and proximate result of Defendants' extreme and outrageous conduct, Riley has suffered severe emotional distress. He attends school each day performing normalcy for his peers while struggling with anxiety, depression, a loss of identity, and a pervasive sense of betrayal by the adults who were charged with protecting him, each of which are so severe he has physical manifestations of the distress. He sought professional mental health treatment, which continues. He lost a five-year relationship. His grades declined. He no longer watches football on television. The sport that gave his life structure, direction, and hope has been so thoroughly contaminated by what Defendants did that it now causes him pain to see it. The emotional harm Riley is real, ongoing, and the foreseeable product of Defendants' intentional and retaliatory campaign against a seventeen-year-old boy who did nothing wrong except tell the truth.

109.    Defendants are jointly and severally liable for Riley's damages under this Count. The District is liable for the acts of its employees and agents acting within the scope of their employment under Government Code § 815.2. Riley is entitled to compensatory and punitive damages from the individual Defendants in amounts to be proven at trial.

**COUNT VII**

**Violation of California Education Code § 220 — Discrimination and Retaliation in a State-Funded Educational Program**

**(All Defendants)**

110.    Riley incorporates by reference all prior allegations as though fully set forth herein.

111.    California Education Code § 220 provides that no person shall be subjected to discrimination in any program or activity conducted by any educational institution that receives state funding on the basis of, among other protected characteristics, race, color, national origin, or ethnicity. The District is a public educational institution that receives state funds and is therefore subject to the mandates of § 220.

112.    Defendants subjected Riley to discrimination on the basis of race and national origin in the District's athletic programs. This discrimination included, without limitation: the repeated use of

21

First Amended Complaint

racial slurs by coaching staff in the presence of Riley and other minority students; the making of comments invoking immigration enforcement targeted at Hispanic and immigrant students in a manner intended to demean and intimidate; the creation and maintenance of a hostile and racially charged environment in which Riley and other minority students were subjected to treatment that was offensive, degrading, and incompatible with equal educational opportunity; and the disproportionate adverse treatment of Riley in connection with his participation in the football program, including his removal from the team following his engagement in protected complaint activity.

113.    California Education Code § 220 independently prohibits retaliation against a person for opposing discriminatory practices or for filing a complaint, testifying, or participating in any proceeding under the Education Code's nondiscrimination provisions. Riley and his parent engaged in protected activity under § 220 by reporting the discriminatory and harassing conduct of the coaching staff to school administrators and by participating in the District's UCP investigation. Following that protected activity, Riley was subjected to the series of adverse actions described in this Complaint, including exclusion from team activities, reduction in playing time, removal from the team, and the post-investigation public humiliation of the "most drama" award.

114.    Unlike the deliberate indifference standard applicable to institutional liability under federal Title VI, California Education Code § 220 imposes liability where a district knew or reasonably should have known of discriminatory conduct and failed to take prompt and effective remedial action. The District knew of the coaching staff's racially hostile conduct through Riley's report to the school principal, the principal's receipt of that report, the UCP investigation that followed, and the District's own findings sustaining the discrimination allegations. Despite this knowledge, the District failed to take prompt and effective action to remediate the discriminatory environment before Riley was harmed, and failed to provide Riley with any meaningful remedy after the investigation was concluded. This failure constitutes a violation of § 220's nondiscrimination mandate and its anti-retaliation provisions.

115.    As a direct and proximate result of Defendants' violations of California Education Code § 220, Riley suffered discrimination, harassment, retaliation, deprivation of equal access to educational programs and activities, emotional distress, physical injury, loss of athletic and educational opportunities, and other compensatory and non-economic damages in amounts to be proven at trial.

22

First Amended Complaint

Riley is also entitled to an award of attorney's fees and costs pursuant to California Code of Civil Procedure § 1021.5 and any other applicable provision of California law.

**VII.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Riley Cochran-Hernandez prays for relief and judgment as follows:

A.  General, special, and consequential damages in an amount to be proven at trial.

B.  Punitive damages (only as to the individual defendants).

C.  An award of attorney's fees and costs to the extent authorized by law or statute.

D.  Preliminary and permanent injunctive relief.

E.  Such other and further relief that this Court may deem just and proper.

Date: June 18, 2026                    **SWEIGART MURDOCK, LLP**


By:    /s/ *Karin M. Sweigart*
       Karin M. Sweigart
       Jesse D. Franklin-Murdock
       Sweigart Murdock, LLP
       1160 Battery Street, Suite 100
       San Francisco, California 94111
       Telephone: (415) 873-0123
       Facsimile: (873) 890-0791
       Email: Karin.Sweigart@sm-llp.com;
       Jesse@sm-llp.com

       *Counsel for Plaintiff*

**JURY DEMAND**

Plaintiff Riley Cochran-Hernandez respectfully demands a trial by jury on all claims and issues for which a jury trial is authorized by law.


Date: June 18, 2026                    **SWEIGART MURDOCK, LLP**


By:    /s/ *Karin M. Sweigart*
       Karin M. Sweigart
       Jesse D. Franklin-Murdock
       Sweigart Murdock, LLP
       1160 Battery Street, Suite 100
       San Francisco, California 94111

23

First Amended Complaint

Telephone: (415) 873-0123
Facsimile: (873) 890-0791
Email: Karin.Sweigart@sm-llp.com;
Jesse@sm-llp.com

*Counsel for Plaintiff*

First Amended Complaint